IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **COLLEEN REILLY, BECKY** : | |
| **BITER, and ROSALIE GROSS,** : | |
| : | **Civ. No. 1:16-CV-0510** |
| **Plaintiffs,** : | |
| : | |
| **v.** : | |
| : | |
| **CITY OF HARRISBURG,** : | |
| **HARRISBURG CITY COUNCIL,** : | |
| **and ERIC PAPENFUSE, in his** : | |
| **official capacity as Mayor of** : | |
| **Harrisburg,** : | |
| : | **Judge Sylvia H. Rambo** |
| **Defendants.** : | |

## M E M O R A N D U M

This First Amendment case comes before the court on remand from the
Court of Appeals for the Third Circuit for reconsideration of Colleen Reilly and
Becky Biter's ("Plaintiffs")[1] motion for a preliminary injunction. In its opinion,
*Reilly v. City of Harrisburg*, 858 F.3d 173, 175 (3d Cir. 2017), *as amended* (June
26, 2017) ("*Reilly II*"), the Third Circuit clarified the proper standard for
determining whether a plaintiff is entitled to preliminary injunctive relief.
Plaintiffs seek to enjoin the enforcement of an ordinance enacted by the City of
Harrisburg (the "City") requiring demonstrators to remain a certain distance from
the entrances, exits, and driveways of health care facilities. After reconsideration

---

[1] As noted by the Third Circuit, Rosalie Gross was a plaintiff in the original action before this
court, *Reilly v. City of Harrisburg*, 205 F. Supp. 3d 620, 636 (M.D. Pa. 2016) ("*Reilly I*"),
*vacated and remanded*, 858 F.3d 173 (3d Cir. 2017), *as amended* (June 26, 2017). Ms. Gross
has since voluntarily dismissed her claims without prejudice and did not join in Plaintiffs'
appeal.

of Plaintiff's motion under the clarified standard articulated in *Reilly II*, this court will deny Plaintiff's motion for a preliminary injunction for the reasons stated herein.

## I.      <u>Factual and Procedural Background</u>

As set forth in this court's prior opinion in *Reilly I*, the relevant factual background is as follows:

> Plaintiffs are individual citizens of Pennsylvania who regularly provide what they euphemistically refer to as "sidewalk counseling" outside of two health care facilities in Harrisburg, Pennsylvania that perform, among other procedures, abortions. Plaintiffs engage in leafletting, prayer, and individual conversations with women who are attempting to enter the health care facilities in an effort to dissuade them from obtaining abortions.
>
> On November 13, 2012, Defendant Harrisburg City Council adopted Ordinance No. 12–2012 entitled "Interference With Access To Health Care Facilities (the "Ordinance")," which became effective on November 23, 2012. [*See*] Harrisburg, Pa. Mun. Code § 3-371 (2015), http://ecode360.com/13739606. The Ordinance's stated purpose is "to promote the health and welfare of [Harrisburg] residents and visitors to [Harrisburg]'s health care facilities, as well as the health and welfare of those who may wish to voice their constitutionally protected speech outside of such health care facilities." Harrisburg, Pa. Mun. Code, § 3-371.2C. The Ordinance makes it illegal for individuals, other than police or emergency personnel performing official functions, or employees of health care facilities that are assisting patients to enter or exit the facilities, to "knowingly congregate, patrol, picket or demonstrate in a zone extending 20 feet from any portion of an entrance to, exit from, or driveway of a health care facility." *Id.* at § 3-371.4A.

*Reilly I* at 624-25 (footnote and citations to the record omitted).

Plaintiffs filed their complaint on March 24, 2016, alleging, *inter alia*, that the "buffer zones" created by the Ordinance made it impossible for them to counsel patients and distribute pamphlets in opposition to abortion at certain health care facilities within the City limits. (Doc. 1, ¶¶ 40-41, 50, 56.) Plaintiffs argue that the Ordinance violates their First Amendment rights to free speech, exercise of religion, and assembly, as well as their Fourteenth Amendment rights to equal protection and due process. On March 25, 2016, Plaintiffs filed the instant motion seeking to preliminarily enjoin enforcement of the Ordinance due to the irreparable harm it causes to their First Amendment rights. (*See* Doc. 3.) Defendants filed a brief in opposition to Plaintiffs' motion for a preliminary injunction and soon thereafter filed a motion to dismiss for failure to state a claim upon which relief can be granted. (Docs. 15, 16.) After briefing on both motions, this court issued an order denying Defendants' motion to dismiss with respect to Plaintiffs' claims under the First Amendment, granting it with respect to all other claims, and denying Plaintiffs' motion for a preliminary injunction. (Doc. 45.) Plaintiffs subsequently appealed this court's order to the Third Circuit, which reversed this court's order to the extent that it denied Plaintiffs' motion for a preliminary injunction, and remanded the matter to this court for further consideration.

On remand, this court held an evidentiary hearing on Plaintiffs' motion for a preliminary injunction on October 31, 2017, and November 1, 2017. Prior to the

hearing, Defendants submitted documentary evidence including declarations from City officials, Planned Parenthood employees, and Plaintiffs, including Rosalie Gross, maps of the areas around the clinic, evidence of the City's financial hardship, video taken around the Planned Parenthood clinic, audio from the committee hearing at which the Ordinance was discussed, and drafts and supporting documentation regarding the Ordinance. Defendants submitted exhibits that included a declaration from Harrisburg police officers, the text of City ordinances, a draft version of the Ordinance, and memoranda and correspondence between City officials and Planned Parenthood employees. At the hearing, Defendants called Councilman Brad Koplinski ("Koplinski"), City Solicitor Neil Grover ("Grover"), City Engineer Wayne Martin ("Martin"), Officer Chad Sunday ("Sunday"), a City Financial Coordinator, Gerald Cross ("Cross"), and Planned Parenthood employees Andrew Guth ("Guth"), Lindsey Mauldin ("Mauldin"), and Sari Stevens ("Stevens"). Plaintiffs testified on their own behalf at the hearing, but did not present additional witnesses. The record is now closed, and the parties have submitted supplemental briefs in support of and in opposition to Plaintiffs' motion. Accordingly, the matter is now ripe for disposition.

## II.     <u>Discussion</u>

The First Amendment right to freedom of speech is fundamental, yet not without limit.  Our Supreme Court has repeatedly held that such limits exist.  *See, e.g.*, *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (acknowledging distinction between protected speech and "incitement to imminent lawless action"); *Miller v. California*, 413 U.S. 15 (1973) (distinguishing "obscenity" from protected speech); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) (explaining that maliciously false and defamatory speech is not entitled to protection); *Virginia v. Black*, 538 U.S. 343 (2003) (plurality opinion) (holding that even cross burning can qualify as protected speech if it is not done with an "intent to intimidate").  Perhaps most poignantly illustrated in *Virginia v. Black*, the content of even vile and hateful speech is entitled to protection; however, the First Amendment does not require the government to allow such speech to be delivered in a violent and assaultive manner.  This complex question, simply put, is whether an ordinance passed by a local government entirely restrains a particular message or merely places reasonable limitations on how that message may be delivered.  Upon thorough examination, this court finds that the Ordinance constitutes the latter.

Plaintiffs move for a preliminary injunction of the enforcement of the Ordinance, arguing that the Ordinance abrogates their First Amendment right to free speech in public fora because it is a content-based restriction that prohibits

only anti-abortion speech and that it is not narrowly tailored to serve a legitimate governmental interest. Defendants had previously moved to dismiss Plaintiffs' complaint in its entirety for failure to state a claim under Rule 12(b)(6); however, this court previously denied Defendants' motion, and Defendants did not appeal that holding. Accordingly, we now resolve Plaintiffs motion for a preliminary injunction under the standard articulated by the Third Circuit in *Reilly II*.

The four factors that a court must consider in determining whether a petitioner is entitled to a preliminary injunction remain unchanged:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted. . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly II* at 176 (quoting *Del. River Port Auth. v. Transam. Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). The Third Circuit, however, did clarify the allocation of the burdens borne by the respective parties:

> [A] movant for preliminary equitable relief must meet the threshold for the first two "most critical" factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief. If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.
>
> . . . .

> In deciding whether to issue a preliminary injunction, plaintiffs normally have the burden of demonstrating a sufficient likelihood of prevailing on the merits. However, in First Amendment cases where "the government bears the burden of proof on the ultimate question of a statute's constitutionality, plaintiffs must be deemed likely to prevail for the purpose of considering a preliminary injunction unless the government has shown that plaintiffs' proposed less restrictive alternatives are less effective than the statute."

*Reilly II* at 179-80 (footnotes and alterations omitted) (quoting *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)). This court previously erred by placing the burden with Plaintiffs to prove all four prerequisites to a preliminary injunction. Under the standard set forth by the Third Circuit, the Plaintiffs, as the moving party, bear the initial burden of demonstrating that they are more likely than not to suffer irreparable harm without a preliminary injunction and have a likelihood of success on the merits. In considering whether Plaintiffs are likely to prevail, Defendants bear the burden to prove "the ultimate question of constitutionality" and must demonstrate that the proposed less-restrictive alternatives are less effective than the Ordinance. To that end, this court shall consider whether Defendants have met their burden, while remaining mindful that preliminary injunctive relief remains an "extraordinary remedy." *Doe v. Boyertown Area Sch. Dist.*, No. 17-3113, 2018 WL 3581456, *4 (3d Cir. July 26, 2018). As a preliminary matter, however, this court will address whether the Ordinance is content neutral, subject to intermediate scrutiny, or content based subject to strict scrutiny.

## A.    Content Neutrality

As discussed in this court's prior decision, an ordinance is subject to strict scrutiny if it is a content-based restriction on speech. *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015). An ordinance restricting speech is content based and subject to strict scrutiny if it: (1) "define[s] speech by particular subject matter;" (2) "define[s] regulated speech by its function or purpose;" (3) cannot be justified "without reference to the content of the regulated speech;" or (4) was "adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* Under strict scrutiny, the challenged law is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests," and the content-based restriction must be "the least restrictive or least intrusive means of serving the government's interests." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016) (citing *Reed*, 135 S. Ct. at 2226).[2]

---

[2] To the extent Plaintiffs suggest that the Third Circuit's holding in *Bruni* is dispositive, the court rejects such a supposition. The District Court in *Bruni* both denied the plaintiffs' motion for preliminary injunction and granted the defendants' motion to dismiss. The plaintiffs appealed only the order dismissing their complaint. Accordingly, the *Bruni* Court examined plaintiffs' complaint under the highly deferential standard applied in the motion to dismiss context. *Bruni*, 824 F.3d at 371 (3d Cir. 2016) ("The City had no opportunity to properly produce such evidence at the motion-to-dismiss stage. Instead, we must accept as true at this stage of the case the Complaint's allegation that "no specific instances of obstructive conduct outside of hospitals or health care facilities in the City of Pittsburgh . . . provide support for the [ordinance].'"). Here, such evidence has been placed on the record and this court may consider it in disposing of Plaintiffs' motion for a preliminary injunction.

Conversely, "[a] regulation that serves purposes unrelated to the content of expression" is content neutral and subject to intermediate scrutiny, "even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746 (1989) (citation omitted). Intermediate scrutiny requires that the challenged law be "narrowly tailored to serve a significant governmental interest." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 764 (1994). Under intermediate scrutiny, the restriction on speech need not be the least restrictive means available, but must "leave open ample alternative channels for communication." *Ward*, 491 U.S. at 791 (citation omitted).

Defendants argue that this Court should decline to reexamine its prior holding in *Reilly I* on the issue of content neutrality because the Third Circuit did not reverse on that issue and the law of the case doctrine precludes review of our prior decision without extraordinary circumstances. (Doc. 101, pp. 9-11 (citing *Habecker v. Clark Equip.*, 942 F.2d 210, 218 (3d Cir. 1991).) We will briefly consider, however, whether any evidence elicited during the preliminary injunction hearing would alter our prior analysis and consider Plaintiffs' arguments to the extent they rely on such evidence. Plaintiffs argue on remand that the Ordinance is not content neutral based on several admissions made by Defendants: "1) Defendants admit that the City enacted the Ordinance because of their concern

with the undesirable impact of pro-life speech on the sidewalk audience; 2) Defendants admit that only discussions 'of substance' are banned . . . and 3) Defendants admit that only some substantive discussions are banned." (Doc. 88, p. 13.)

In support of their first argument, Plaintiffs cite to several cases holding that a law or regulation is not content neutral if it was enacted due to "undesirable effects that arise from the 'direct impact of speech on its audience' or 'listeners' reactions to speech.'" *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (citing *Boos v. Barry*, 485 U.S. 312, 321 (1988)). Defendants, however, fail to distinguish between the "undesirable effects" referenced in *McCullen v. Coakley* and legitimate restrictions on certain acts that are indirectly associated with particular speech. In *Boos v. Barry*, the Supreme Court examined a Washington D.C. ordinance prohibiting signage offensive to foreign governments from being placed near embassies. The Court held that the regulation was content-based because it was enacted to protect the dignity of foreign officials rather than regulate harmful secondary effects caused by such signage. *Boos*, 485 U.S. at 320-321. Justice O'Connor explained the distinction between a regulation based on content and a regulation dealing with "secondary effects" caused by a particular type of establishment:

The regulation [limiting zoning of] theaters that specialize in adult films . . . applied only to a particular category of speech, its justification had nothing to do with that speech. The content of the films being shown inside the theaters was irrelevant and was not the target of the regulation. Instead, the ordinance was aimed at the secondary effects of such theaters in the surrounding community, effects that are almost unique to theaters featuring sexually explicit films, *i.e.*, prevention of crime, maintenance of property values, and protection of residential neighborhoods. In short, the ordinance in [*Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)] did not aim at the suppression of free expression.

Respondents . . . argu[e] that here too the real concern is a secondary effect, namely, our international law obligation to shield diplomats from speech that offends their dignity. We think this misreads *Renton*. We spoke in that decision only of secondary effects of speech, referring to regulations that apply to a particular category of speech because the regulatory targets happen to be associated with that type of speech. So long as the justifications for regulation have nothing to do with content, *i.e.*, the desire to suppress crime has nothing to do with the actual films being shown inside adult movie theaters, we concluded that the regulation was properly analyzed as content neutral.

Regulations that focus on the direct impact of speech on its audience present a different situation. Listeners' reactions to speech are not the type of "secondary effects" we referred to in *Renton*.

*Id.*

Here, the City did not seek to ban speech regarding abortion because it "offended the dignity" of those seeking to patronize the clinics. The City sought to limit the areas in which any and all protesters[3] could congregate around clinic entrances because such large groups tended to impede clinic visitors and to engage

---

[3] A brief note on nomenclature: Plaintiffs consistently refer to themselves as "counsellors" throughout their filings. The distinction in this opinion is purposeful and relevant. As discussed at length, *infra*, the Ordinance does not, by its terms, prohibit many aspects of the "counselling" touted by Plaintiffs. The Ordinance's aim is to restrict aggressive acts of demonstration and protest around the clinic property. Thus, unless otherwise noted, the term "protesters" refers generally to those performing the acts prohibited by the Ordinance.

in aggressive and confrontational behavior. The Ordinance does not appear to even implicate the secondary effects doctrine, as it regulates particular acts (knowingly congregating, patrolling, picketing or demonstrating) rather than a type of speech that tends to result in negative effects as did adult-themed theatres in *Renton*. Any type of speech would be equally prohibited if the proponents of that speech were performing any of the proscribed actions within the buffer zone. The regulatory targets, *i.e.* protestors outside clinics, happen to be associated with particular types of speech, *i.e.* anti-abortion speech. *McCullen v. Coakley*, 134 S. Ct. at 2531. ("[A] facially neutral law does not become content-based simply because it may disproportionately affect speech on certain topics. On the contrary, '[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.' The question in such a case is whether the law is 'justified without reference to the content of the regulated speech.'") (citing *Ward*, 491 U.S. at 791) (quoting *Renton*, 475 U.S. at 48 (1986)). Here, the Ordinance is justified by the actions of the protesters rather than the content of their speech.

Plaintiffs additionally rely on *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. D.C.*, 972 F.2d 365 (D.C. Cir. 1992) for the proposition that unintentional incitement to violence is not a content-neutral reason for limiting the time, place, and manner Plaintiffs may demonstrate. The holding in *Invisible*

*Empire*, however, was based on the Ku Klux Klan's request to peacefully march in a parade along with numerous other groups. The D.C. Circuit held that the audience's theoretical *hostile acts* in response to *passive speech* was insufficient to demonstrate a content neutral reason for the regulation. *Id.* at 374; *see also Startzell v. City of Philadelphia*, No. 05-cv-5287, 2007 WL 172400, *9 (E.D. Pa. Jan. 18, 2007), *aff'd sub nom. Startzell v. City of Philadelphia*, 533 F.3d 183 (3d Cir. 2008) (distinguishing a "heckler's veto" from reasonable time, place, and manner restrictions). Conversely, here, the content of the speech is irrelevant; it is the time, place, and alleged encroachment into the personal space of clinic patrons that the City found objectionable, not the mere message.

Plaintiffs next cite a statement made by Neil Grover, Defendants' corporate designee and city solicitor, regarding the enforcement of the Ordinance with respect to congregating. Grover testified that "[i]f two people were talking about anything of substance, I think the answer is, they're congregating." (Hearing Transcript ("Tr."), p. 355.) Plaintiffs argue that this statement indicates that the Ordinance would require police officers to determine the content of the speech before enforcing it. This argument is patently without merit. Assuming, *arguendo*, that Grover's method of interpretation is binding on the City for future enforcement, no inquiry into the content is required to determine if a conversation is substantive. Grover's comments were used to illustrate that the Ordinance did

not prohibit two individuals from engaging in a passing greeting: "If two people were walking in the same direction . . . and they're talking . . . good morning, good afternoon, whatever, I don't know if those people would be considered congregating by any definition." (*Id*.) Plaintiffs' argument assumes that police officers are ignorant of social norms and average human behavior. If Plaintiffs' assumption were true, police would be incapable of distinguishing a woman walking down the street with a paramour from a woman being harassed or accosted by a stranger. A police officer is more than capable of distinguishing calm pamphleting by an individual from a group of people marching up and down the street with banners and bullhorns. An officer need not hear the precise content of what is being said, but can easily distinguish normal social interaction from protest or assault without regard to the content of the speech. *See Hill v. Colorado*, 530 U.S. 703, 721 (2000) ("[I]t is unlikely that there would often be any need to know exactly what words were spoken in order to determine whether 'sidewalk counselors' are engaging in 'oral protest, education, or counseling' rather than pure social or random conversation."). Here, police may enforce the Ordinance by making objective determinations without inquiry into the content of the speech.

Finally, Plaintiffs argue that Counsel for Defendants admitted at argument before the Third Circuit that the enforcement of the Ordinance would depend on the content of the speech. Counsel responded to a line of questioning from Circuit

Judge Jordan wherein Judge Jordan asked whether panhandling or leafletting for a business would be considered "demonstrating" under the Ordinance. Counsel posited that panhandling and leaflet distribution may not be covered, but distribution of anti-abortion pamphlets would be prohibited. Plaintiffs cite no Third Circuit precedent for their argument that a legal theory posited by counsel at an appellate argument is binding on the court. The cases from other circuits cited by Plaintiffs relate to attorneys conceding particular arguments or claims at oral arguments. *Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1170 n.3 (9th Cir. 2001); *McCaskill v. SCI Mgmt. Corp.*, 298 F.3d 677, 680 (7th Cir. 2002). The Third Circuit, however, has held that "[t]o be binding, admissions must be unequivocal. Similarly, they must be statements of fact that require evidentiary proof, not statements of legal theories." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 377 (3d Cir. 2007), *as amended* (Oct. 12, 2007) (citing *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir.1972)). Furthermore, the Supreme Court has cautioned courts against placing great weight on comments made by counsel in the face of appellate questioning: "We are loathe to attach conclusive weight to the relatively spontaneous responses of counsel to equally spontaneous questioning from the Court during oral argument." *Moose Lodge v. Irvis*, 407 U.S. 163, 170 (1972). Accordingly, this court declines to view counsel's spontaneous remark during appellate argument as a conclusive admission that the Ordinance is content based.

Finding no merit to Plaintiffs' new arguments that the Ordinance is content based, the court reaffirms is prior holding that the Ordinance is content neutral and can be justified "without reference to the content of the regulated speech." *Reed*, 135 S. Ct. at 2227. Accordingly, the court will review the Ordinance under an intermediate scrutiny analysis.

**B.    Likelihood of Success on the Merits**

To determine whether Plaintiffs are entitled to a preliminary injunction, the court must next examine whether Plaintiffs have a likelihood of success on the merits of their claim, applying an intermediate scrutiny analysis to the Ordinance. Under the intermediate scrutiny analysis, Plaintiffs would ordinarily need to show that the Ordinance is "not narrowly tailored to serve a significant governmental interest" and fails to "leave open ample alternative channels for communication of information." *McCullen*, 134 S. Ct. at 2534 (citing *Ward*, 491 U.S. at 791). In a challenge based on the First Amendment, however, the City "bears the burden of proof on the ultimate question of [the Ordinance's] constitutionality," and "[Plaintiffs] must be deemed likely to prevail [for the purpose of considering a preliminary injunction] unless the [City] has shown that [Plaintiffs'] proposed less restrictive alternatives are less effective than [the Ordinance]." *Reilly II* at 179-80

(footnotes omitted) (quoting *Ashcroft*, 542 U.S. at 666). Thus, the City bears the initial burden to show that the ordinance is narrowly tailored. *Id*. at 180.[4]

i.      *Burden on Plaintiffs' right to free speech.*

Irrefutably, the Ordinance places *some* burden on Plaintiffs' right to free speech, but to determine whether the ordinance is narrowly tailored to achieve the City's legitimate interests, the court must define the extent of the burden upon Plaintiffs' rights. Plaintiffs first argue that the Ordinance places a substantial burden on their First Amendment right to free speech. Defendants counter that any burden faced by Plaintiffs is minimal and more than justified by the City's legitimate interests. Plaintiffs do not argue that they are unable to be seen and heard by clinic patients from outside the buffer zone. Instead, Plaintiffs suggest that the First Amendment includes a right to intimate conversation and to "be so close you can reach out and hug [clinic patients]." (Doc. 88, p. 31 of 100.) There is no such right to make physical contact with unconsenting strangers couched in the First Amendment, but, despite the substantial evidence that Plaintiffs and other protesters are more likely to offer patients virulent invective than a warm embrace,

---

[4] Plaintiffs do not appear to contest that the City has a significant governmental interest "in 'ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services.'" *McCullen v. Coakley*, 134 S. Ct. at 2535 (quoting *Schenck v. Pro–Choice Network of Western N.Y.*, 519 U.S. 357, 376 (1997)). Thus, the court finds that the City demonstrated a legitimate government interest identical to the legitimate interest recognized in *McCullen* and *Schenk*. Thus, the City has met its burden to prove that element of the intermediate scrutiny analysis.

the Supreme Court in *McCullen* has held that individuals such as Plaintiffs are entitled to have their speech heard in an effective manner. *McCullen*, 134 S. Ct. at 2537 ("If all that the women can see and hear are vociferous opponents of abortion, then the buffer zones have effectively stifled petitioners' message."). Specifically, *McCullen* held that an anti-abortion protester has a protected First Amendment right to engage other members of the public in a conversational tone without resort to signs, shouting, or voice amplification. *McCullen*, 134 S. Ct. at 2527. Although decided prior to *McCullen*, the Third Circuit in *Brown v. City of Pittsburgh*, 586 F.3d 263, 276 (3d Cir. 2009), presciently modified a similar Pittsburgh ordinance consistent with this concept.

In *Brown*, the city of Pittsburgh had enacted an ordinance that consisted of a two-pronged "buffer" and "bubble" zone. The buffer zone prevented congregating, patrolling, picketing, or demonstrating within 15 feet of clinic entrances and exits, while the bubble zone extended 100 feet from the clinic entrance. Within the bubble zone, protesters were prohibited from coming within 8 feet of any individuals attempting to access the clinic. The *Brown* Court enjoined the enforcement of the bubble zone, but allowed the buffer zone to remain. This is consistent with the Supreme Court's mandate in *McCullen*; a counsellor could easily approach a potential patient outside the buffer zone to hand out a leaflet or converse with someone inside the buffer zone at a normal volume.

A key difference between the Pittsburgh ordinance and the Massachusetts ordinance in *McCullen* is the specific type of behavior prohibited. The Massachusetts ordinance made it a crime simply to knowingly stand within the 35 foot buffer zone. *McCullen*, 134 S. Ct. at 2531 ("Indeed, petitioners can violate the Act merely by standing in a buffer zone, without displaying a sign or uttering a word."). The Ordinance, like the ordinance in *Brown*, prohibits only certain conduct. As written, the Ordinance does not bar a single individual from walking into the buffer zone and calmly handing a pamphlet to an individual. If receptive, a passerby may take the pamphlet. The importance of this distinction is obvious: where a group may bully and intimidate a single person, an individual simply offering a piece of paper, as Plaintiffs claim to desire, may offer a supportive presence. Of course, the calm pamphleting could quickly turn into demonstrating or picketing if the individual offering the pamphlet begins to loudly advocate for his or her position, carries a sign, or accosts unwilling patients. This is perhaps the distinction that counsel for Defendants was alluding to at argument before the Third Circuit. *See supra*, at 14-15. Thus, Plaintiffs are not totally barred from the buffer zone, but their conduct therein, and consequently, their ability to engage in intimate conversation, is limited.

The Supreme Court in *McCullen* held that counsellors have a right not only to speak in public fora, but to have their speech heard in an effective manner.

Plaintiffs rightly point out that in *McCullen* "petitioners [were] effectively excluded from a 56-foot-wide expanse of the public sidewalk in front of the [Boston] clinic" and that exclusion placed "serious burdens" on the petitioners' ability to engage in sidewalk counselling. *See McCullen*, 134 S. Ct. at 2527. Plaintiffs mischaracterize the Supreme Court's holding in *McCullen* to the extent they suggest that *McCullen* stands for the proposition that a 35 foot buffer zone is unconstitutional simply because of the area it covers. Instead, the Supreme Court engaged in a much more nuanced examination. For instance, the Court noted the paucity of evidence supporting the statewide need for such a buffer. The Massachusetts law applied to an entire Commonwealth without a particular examination of the needs of individual communities. *McCullen*, 134 S. Ct. at 2539 ("For a problem shown to arise only once a week in one city at one clinic, creating 35-foot buffer zones at every clinic across the Commonwealth is hardly a narrowly tailored solution."). Moreover, the Massachusetts law was far broader in its prohibitions than the City's: it did not merely limit certain types of public demonstration, but instead prohibited simply standing on the sidewalk outside of a clinic. The Ordinance is much more limited in its purview: it prohibits only knowingly congregating, patrolling, picketing or demonstrating. A single individual handing out fliers does not appear to fit within the actions prohibited by the Ordinance. Individuals run afoul of the Ordinance only when they gather

together in groups ("congregate") and hold up banners, pickets, or similar signage ("picket" or "patrol") or chant, shout, or use voice amplification to vociferously express their message ("demonstrate") within the buffer zone. They must also do so "knowingly." Thus, Plaintiffs' fear that they would be arrested for stepping a few inches over the line is misplaced. *See Hill*, 530 U.S. at 727; *Brown*, 586 F.3d at 291 n.34; *Bruni*, 824 F.3d at 384 (Fuentes, concurring). Neither buffer zone requires protesters to move to the opposite side of the street as did the Massachusetts law. *McCullen*, 134 S. Ct. at 2527-2528. Planned Parenthood employees testified that they are able to hear Plaintiffs' speech at a conversational volume from outside of the buffer zones. (Tr. at 159-160; 186-187.) Plaintiffs both admit that they would be able to walk with potential patients up or down the sidewalk until they reached the buffer zone, hand out literature, and speak to individuals coming out of the front door of Planned Parenthood. (Tr. 279-283; 297-298.) Put another way, the Ordinance does not specifically prohibit the type of expression that the *McCullen* Court found essential to the exercise of First Amendment rights. Concluding that the Ordinance limits certain acts within the buffer zone, the court now turns to the degree of limitation imposed by the physical boundaries of the buffer zone.

Although the physical size of the buffer zone is only one factor to be considered in determining the limits imposed by the Ordinance, it is the factor that

has garnered the most attention from the parties in this case. Plaintiffs repeat throughout their briefs that the Ordinance creates an effective 70-foot barrier around the clinic because of the combination of the 20-foot buffer zones. Specifically, the buffer zones extend from either edge of the driveway and the outermost part of the clinic doorway.[5] Taken at face value, the "effectively 70-foot" barrier created by the Ordinance is even more burdensome than the 56-foot barrier in *McCullen*. As illustrated by Defendants, however, this is not the whole picture.

Defendants demonstrate that the buffer zones remove relatively little space that was previously available to Plaintiffs. The sidewalk comprising the northernmost expanse of the buffer zone includes approximately 15 feet of a neighbor's driveway, which Plaintiffs were previously prohibited from blocking. (Tr., p. 131-132, 136; Pls. Ex. 9, p. 4.) Thus, only five feet of sidewalk between the edge of the clinic driveway and the neighbor's driveway has been restricted. (*Id.* at 132.) Notably, Defendants presented evidence that the City had previously considered a somewhat larger buffer zone, but reduced the expanse to give Plaintiffs a four-foot wide area to protest directly in front of the clinic entrance, but

---

[5] Plaintiffs note that the buffer zone that was recently upheld by the Western District in *Bruni v. City of Pittsburgh*, 283 F.Supp. 3d 357, 356 (W.D. Pa. 2017), did not include driveways. As illustrated in the photograph of the Pittsburgh Planned Parenthood clinic, attached as Exhibit G to Plaintiffs' brief, it does not appear that the Pittsburgh clinic had a driveway at all, but instead was located in an urban environment.

out of the way of patients walking in and out of the clinic. (*Id.* at 49-51, 131-132; Doc. 59-7, p. 51; Defs. Ex. 20; Pls. Ex. 9, p. 4.) Approximately one-third of the southernmost portion of the buffer zone includes private property owned by Planned Parenthood from which Plaintiffs were already restricted. (Tr. at 143-144; Pls. Ex. 9, p.4.) Plaintiffs curiously complain that the four-foot area directly in front of the clinic is useless for counselling, yet seem to argue that the five-foot area between the Planned Parenthood driveway and the neighboring driveway is essential to their purpose. (Doc. 88, p. 39.) Thus, the sum total of the area restricted by the buffer zones is between 15 to 20 feet of sidewalk on one side of the street. This appears to be in contrast to the buffer zone in *McCullen*, which encompassed "a 56-foot-wide expanse of the *public sidewalk*" and "*more than 93 feet* of the sidewalk (including the width of the driveway) and extending across the street and nearly *six feet onto the sidewalk on the opposite side*. McCullen*, 134 S. Ct. at 2527 (emphasis added).[6] These measurements demonstrate that the Ordinance creates a buffer zone less physically restrictive than the buffer zone in *McCullen*.

---

[6] Although this court granted Plaintiffs' request to file a sur-reply to Defendants' post-hearing reply brief (Docs. 101, 107, 108), Plaintiffs do not contradict the City's calculation that the Massachusetts buffer zone covered an area of 3848.45 square feet total, 2481.63 square feet of public property, but the Ordinance restricts only 824.16 square feet total and 469.66 square feet of public property. (Doc 101, p. 45.)

To reiterate, the evidence presented by both parties demonstrates that the Ordinance effectively restricts Plaintiffs and other protesters from performing certain acts of "counselling" on 15-20 feet of sidewalk that was previously available to them. In essence, this constitutes a minor physical restriction on a profound right. It is unclear from prior precedent whether any appreciable physical restriction on Free Speech is "substantial" under the analysis clarified by *McCullen*. Accordingly, although the limitation is slight in many respects, the court concludes that it is substantial enough to shift the burden to the City to show that it tried less-restrictive alternatives that failed or seriously considered other available alternatives.

ii.    *Consideration of less-restrictive alternatives*

Because Plaintiffs have met their burden to show that the buffer zones place a substantial limit on their free speech rights, the City now bears the burden to show that it considered less-restrictive alternatives or that less-restrictive alternatives were tried and failed. *Reilly II* at 180. At the evidentiary hearing, Defendants presented evidence of the difficulty enforcing other laws that would have prevented the acts complained of by the City, the City's financial difficulty increasing its police force, and the documentary evidence considered by the City council. The City also introduced audio of the hearing and related testimony from Planned Parenthood employees. The City argued that this evidence, taken

together, demonstrates that alternative methods had failed and that the City considered numerous alternatives, but was constrained by its dire financial limitations from moving forward with other methods of enforcement. Plaintiffs argue that the City failed to affirmatively consider alternative, less-restrictive, methods of achieving its legitimate governmental interest. In support of this argument, Plaintiffs refer to the brevity of the hearing at which the Ordinance was enacted and the surfeit of alternative laws that would achieve the same goal of preventing protesters from interfering with clinic patients.

Plaintiffs argue that the Defendants bear the burden of producing a "meaningful record" that the City "closely examined and ruled out for good reason" less-restrictive alternatives to the Ordinance. (Doc. 88, p. 56 (citing *Bruni*, 824 F.3d at 369-370 (3d Cir. 2016)).) Plaintiffs interpret this requirement to mean that, in the course of a council hearing, the City legislators must introduce evidence to support the problem they seek to rectify and address exhaustively the potential options for solving the problem. Although the discussion held by councilmembers must be considered in determining if Defendants can show they seriously considered less-restrictive alternatives, a council hearing is not a trial where relevant exhibits must be placed into evidence. *See Bruni*, 824 F.3d at 370 n.14 (discussing the need to examine the "legislative record" before the lawmaking body). Such an onerous burden on a city's legislature would likely stymie any

action on local ordinances. It would be reasonable to assume, and likely unreasonable not to assume, that an elected body is generally aware of the needs and faculties of the municipal entity it represents and need not be reeducated before voting on each piece of legislation before it. *See Metromedia, Inc. v. San Diego*, 453 U.S. 490, 508–12 (1981) (opinion of White, J., joined by Stewart, Marshall & Powell, JJ.) ("[the Court] hesitate[s] to disagree with the accumulated, common-sense judgments of local lawmakers"); *Bruni*, 824 F.3d at 377 (Fuentes, concurring) ("A local ordinance enacted by a local lawmaking body is naturally distinct from a state government that "enacts a blanket prohibition to address a localized problem.")

Moreover, Plaintiffs argue that the City was required to systematically analyze the available alternatives during the single hearing put on the record. The City clearly received input from its citizens and had available police reports of calls made by Planned Parenthood and testimony that protesters were impeding access to the clinic and threatening and intimidating patients. *Bruni* and *McCullen* did not specifically require that the local government produce all available evidence and consider alternatives at a single, recorded hearing before taking action. Instead, they require only that "substantially less-restrictive alternatives were tried and failed, or that the alternatives were closely examined and ruled out." *Bruni*, 1824 F.3d at 370 (citing *McCullen*, 134 S. Ct. at 2540). Considering the

evidence submitted by the City, the court concludes that Defendants have met their burden of showing that the City's less-restrictive alternatives were ineffectual and that the City gave due consideration to available options before enacting the Ordinance.

The City has introduced evidence of the specific consideration given to the Ordinance before its passage. The audio recording of the hearing at which the Ordinance was discussed includes approximately 18 minutes of discussion regarding the Ordinance, which amounts to 12 pages of transcripted text. (Defs. Ex. 26.) The hearing itself includes testimony by a Planned Parenthood employee, Guth, and a neighborhood resident, Yost, both describing the harm caused in the neighborhood surrounding the clinic. Specifically, Guth read into the record a statement by Heather Shumaker, Director of Public Affairs for Planned Parenthood, which described that protesters: (1) would follow patients from the sidewalk to the clinic door, screaming at them, insulting them, and calling them murderers; (2) would take pictures of patients and employees and write down license plate numbers, to insinuate threats of future harm or harassment; (3) would trespass onto clinic property to bang on windows or take photos inside the clinic; (4) would wait around either side of the clinic driveway until a car attempted to enter the driveway, then slowly walk across it in an attempt to impede and deter cars from entering the clinic parking lot. (*See* Pls. Ex. 20.) Yost testified that the

protesters generally disturbed neighborhood residents with loud yelling and blocking the sidewalk on a regular basis. Yost further testified that she had participated in "counter-protests" around the clinic. At these counter-protests, Yost stated that anti-abortion protesters would brandish pepper spray at the counter-protesters and scream into the counter-protesters' faces.[7] No testimony in opposition to the Ordinance was offered at the hearing. Although the discussion at the hearing was brief, testimony presented by Defendants demonstrate that the hearing testimony was the tip of the iceberg of consideration given to the Ordinance.

A draft version of the Ordinance was originally supplied by Planned Parenthood to Councilman Koplinski to address problems seen at the clinic parallel to problems addressed at other clinics throughout the country. (Doc. 59-4, pp. 7-9.) After the draft was given to Koplinski, it was submitted to the City's Law Bureau for review. (*Id*.) As a matter of course, the Bureau would review the constitutionality of any ordinance before it was presented to the full council for review. (*Id*.) Although we give no deference to the determination of the constitutionality by the Bureau, it is relevant for purposes of determining whether the City gave due consideration to alternatives that the City's Law Bureau reviewed the statute. After review by the Law Bureau, the proposed ordinance was

---

[7] Notably, counter-protests as described by Yost would clearly be prohibited by the terms of the Ordinance.

read at a "reading meeting" of the City council. (Doc. 59-5, pp. 46-47.) This meeting was considered a mere formality at which the text of the draft was read aloud at a public meeting. (*Id.*) After the reading meeting, the bill was submitted to a committee of the council for consideration. (*Id.* at 47.) Between the initial reading and the committee consideration, the draft was modified in two substantive respects. First, driveways were included in the areas covered by the buffer zones. (Tr., p. 49.) Second, the Planned Parenthood draft included a buffer zone of 24 feet as opposed to 20 feet. (*Id.*) The committee considered 15-foot buffer zones and larger zones up to 30 feet. (Doc. 59-5, p. 49.) The 20-foot buffer was considered to be the "middle ground where it was a safe enough space for people to feel comfortable to be able to gain access to and from the clinic and also where individuals could speak at a reasonable voice . . . to be able to get their points across." (*Id.*) Thus, the City has presented evidence that the distance was not arbitrarily chosen, but was specifically considered the most appropriate distance to adequately protect the employees and patients of the local clinics.

### iii. *Less-restrictive alternatives were tried and failed*

Plaintiffs have failed to show a feasible, less-restrictive alternative was available to the City. *See Reilly II* at 179-80; *see also Traditionalist Am. Knights of the Ku Klux Klan v. City of Desloge, Mo.*, 775 F.3d 969, 978 (8th Cir. 2014) (concluding that the district court abused its discretion in granting a preliminary

injunction against enforcement of an ordinance prohibiting distribution of leaflets along roadways) ("In contrast to *McCullen*, the record here does not show an obvious, less burdensome alternative that the city [] should have selected."). Plaintiffs suggest three distinct less-restrictive alternative methods of achieving their goals: (1) existing state, federal, and local laws; (2) targeted injunctions against specific violators; and (3) crafting a less-restrictive ordinance.

Plaintiffs cite five relevant laws and ordinances that they suggest would be less-restrictive alternatives to the Ordinance: (1) 18 Pa. Code 3503(b) (Defiant Trespass); (2) Harrisburg Ordinance 3-341 (disturbing the peace); (3) Harrisburg Ordinance 3-343 (noise disturbances); (4) Harrisburg Ordinance 3-339 (malicious loitering); and (5) the federal Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. 248. Because *Bruni* and *McCullen* require evidence that "substantially less-restrictive alternatives were tried and failed, *or* that the alternatives were closely examined and ruled out," the court may examine whether these existing statutes were effective and need not limit its inquiry to whether the City council affirmatively acknowledged their failure at a hearing. *Bruni*, 824 F.3d at 370 (citing *McCullen*, 134 S. Ct. at 2540) (emphasis added). It is uncontested that these statutes were available to law enforcement at the time the Ordinance was being considered. It does not appear that any prosecutions under these statutes were brought by the City or private citizens; however, the City has produced

records of police being called to Planned Parenthood for the harms that the City sought to correct by enacting the Ordinance. (Defs. Ex. 33.) Koplinski addressed each of the statues cited by Plaintiffs during the hearing. Koplinski testified that his experience was that police would not be able to timely respond to complaints of the trespass statute, noise ordinance, and disorderly conduct ordinance. (Tr., p. 34-38.) Essentially, between when police were called and when they arrived, the protesters would have retreated from the offending conduct. (*Id*.) Also at the committee hearing, when questioned about the enforcement of noise ordinances generally, the Chief of Police stated that such laws are difficult to enforce unless the officer happens to be at the location at the time of the offense. (Defs. Ex. 26, Hearing Audio at 52:30-53:03.) Plaintiffs argue that the City council, at the hearing, instructed the Chief to enforce the noise ordinance more often, yet failed to do the same with the laws and ordinances noted above at Planned Parenthood. Contrary to Plaintiffs assertions, police may enforce certain ordinances stringently throughout the City more easily than enforcing particular laws at a particular location. The former would require an officer to look for certain offenses that may have been considered "minor" or exercise his or her discretion to issue citations more frequently for certain offenses; the latter would require an officer to deviate from his or her typical patrol route or remain stationary at a certain location instead of patrolling the City. Thus, a councilperson's instruction to "enforce noise

ordinances" more often does not imply that such a simple mandate would effectively remedy the problems at the clinic.

In order to effectively enforce these existing laws, the council reasoned that increased police presence would be necessary, but knew that it was without the financial resources to do so. The council was specifically informed of the City's inability to hire new police officers to increase patrol routes. The Pennsylvania Department of Community and Economic Development ("DCED") issued several requirements for the City's receivership status in November 2011. (Defs. Ex. 6; Tr. 230.) Relevantly, no additional officers could be hired or expenditures of over $2,500 could be made without prior DCED approval. (*Id*.) This notice from DCED was addressed directly to the Council President. (*Id*.) The City has produced an abundance of evidence demonstrating the City's poor financial standing. (*See* Defs. Exs. 2, 3, 5, 6.)[8] Koplinski further testified as to the pervasive nature of the City's financial situation:

> We were, as a city, we had gotten into some significant financial difficulty; 300 million dollars in debt due to a botched incinerator project. And we were trying to find out ways to get out of that

---

[8] Plaintiffs filed a notice of objections to several exhibits and portions of transcripts introduced by Defendants at the preliminary injunction hearing. (Doc. 106.) Specifically, Plaintiffs objected to Exhibits 2, 3, 5, and 6 as irrelevant under Federal Rule of Evidence 401, or more prejudicial than probative under Rule 403. As explained herein, Exhibits 2, 3, 5, and 6 are relevant to show the City's prior knowledge of its financial situation for purposes of determining whether the City adequately considered less-restrictive alternatives to the Ordinance. Accordingly, Plaintiffs' objections are overruled with respect to Exhibits 2, 3, 5, and 6, and Plaintiffs' remaining objections are sustained.

threatened bankruptcy. This was not, of course, only a local story, it was a statewide and national story as well. I did interviews on CNN and other outlets. It was well-known that the city was having extreme financial difficulties in 2011 and 2012. We were making some significant decisions as to how to eliminate that debt. But we were under a receiver, state-appointed, and had very strict financial controls over the city.

. . . .

We had multiple scares in which the city was not going to be able to make payroll. Only emergency loans were able to take care of that. Police situation was not good. Our compliment on the streets was as low as four officers on the street at any particular time. You could say that there literally were street lights out. I mean, maybe not to the point of keeping the lights on at City Hall, but pretty darn close.

(Tr., p. 26.)

Q. Now did the city have the financial resources to station a police officer at both Hillcrest and at Planned Parenthood to enforce statutes such as the trespass ordinance?

A. Absolutely not.

(Tr., p. 34.)

Because of these financial limitations, the City argues that it is unable to afford additional police officers to patrol the area around Planned Parenthood on a regular basis. *Cf. McCullen*, 134 S. Ct. at 2540 ("[T]he police maintain a significant presence outside Massachusetts abortion clinics."). Plaintiffs do not appear to contest the City's financial status, but argue only that the City did not specifically make a formal determination that it could not afford police staffing at Planned Parenthood. The City has produced substantial evidence that it has experienced difficulty increasing its police force due to its inability to adequately fund its police operations. *Cf. Turco v. City of Englewood*, No. 15-cv-3008, 2017

WL 5479509, *5 (D.N.J. Nov. 14, 2017) ("[Englewood] fails to provide any reliable documentation or support for its assertion that . . . the City did not have the resources to have a continuous [police] presence at the site."). Plaintiffs fail to contradict this assertion, but suggest that the City is required to perform an analysis to determine that it cannot afford new police officers. Such a requirement is completely without support either in logic or the law. A cash-strapped City that is aware of its need for frugality need not spend money it cannot afford to confirm what it already knows. *Chamber of Commerce for Greater Philadelphia v. City of Philadelphia*, No. 17-cv-1548, 2018 WL 2010596, *9 (E.D. Pa. Apr. 30, 2018) ("To meet its burden of showing that a law 'directly advances' a substantial interest, the City must establish that *the harms it recites are real and that its restriction will in fact alleviate them to a material degree.*") (emphasis added) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)) (citing *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994)). Thus, with respect to the state laws and local ordinances, the City council was aware of their ineffectiveness and the City's financial inability to adequately enforce them.

Koplinski also testified that he had previously been counsel on a special task force within the Department of Justice that specifically litigated FACE claims. (Tr., pp. 61-62.) He noted the difficulty in bringing civil suits under FACE contrasted with the effectiveness of summary criminal offenses, and explained that

the City would likely face difficulty funding protracted civil litigation in federal court.  (Id. at 61-62; *see also* Doc. 59-5, pp. 130-131.)   Beyond the City's consideration of the difficulties in enforcing FACE, it does not appear that the City has authority to bring a civil action under that statute.  FACE gives a right to sue to any "person" aggrieved by certain prohibited acts and a person "lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship."  18 U.S.C. 248(c)(1)(A).  FACE also empowers the United States Attorney General and State Attorneys General as *parens patriae* to bring similar enforcement actions.  18 U.S.C. 248(c)(1)(A).  Thus, it appears that, even if the City had desired to increase enforcement under FACE, it was without authority to do so.

It does not appear from the record that any consideration was given to seeking injunctions against individual protesters.  Defendants only argument why they failed to do so is that it would be financially unfeasible to do so.  The City offers no evidence of the cost to seek such injunctions or any reasons why they are beyond the typical expenses of the City's Legal Bureau.  Thus, the court finds that Defendants did not consider personal injunctions against protesters.  Regarding a less-restrictive buffer zone ordinance, the City did specifically consider a buffer zone of 15 feet, but after consultation with the City solicitor and clinic personnel,

rejected that distance as failing to adequately cover the specific areas around the clinic. (Doc. 59-5. p. 49.)

There also appears to be evidence that the City stopped enforcing the buffer zones in the wake of *McCullen*, although it is unclear who or if any individual informed police that *McCullen* rendered the buffer zone inoperable. (*See* Pls. Exs. 44, 47.) On August 22, 2015, Planned Parenthood employees experienced a large scale protest that included an estimated 100 anti-abortion protesters as well as approximately 15 counter-protesters. (Pls. Ex. 44.) The employees believed, and were apparently informed by police, that the buffer zones were unenforceable. (*Id.*) After this large protest, Neil Grover, the City solicitor, issued a directive to the police bureau stating that the buffer zone was still enforceable. (Pls. Ex. 47.) There is no record of further large scale protests after that date. Plaintiffs argue that it is unreasonable to infer that the *McCullen* decision, which was issued on June 26, 2014, could have been causally related to the protest 14 months later. Although by no means definitive, it is conceivable that the two are directly linked. The *McCullen* decision did not wholesale invalidate all buffer zones around clinics, nor did it invalidate buffer zones of a particular size or scope. In fact, no decision has yet invalidated the Ordinance. It is not unreasonable to conclude that *McCullen* was misconstrued by officers who stopped enforcing the Ordinance over time. This process may have been gradual as there is no evidence of any formal

directive or instruction to that effect. It may have similarly taken months for protesters to discover that the Ordinance was *de facto* unenforceable, and more months yet to organize a protest of 100 individuals. That said, there is no evidence that *McCullen* directly led to Harrisburg police ceasing to enforce the Ordinance. There is, however, evidence that the Ordinance was not being enforced in August 2015 when the large-scale protest and counter-protest occurred. Thus, there is support for an inference that the Ordinance did have some ameliorative effect on the problems that it sought to resolve. (*See* Pls. Exs. 44, 50, ¶¶ 19-20.)

The record is clear that the City had undertaken some examination of alternatives to the Ordinance. The crucial question is whether it gave *enough* consideration to such alternatives. The council was aware that hiring additional police to patrol the clinic was financially unworkable and that enforcement of existing ordinances was an ill-fitting solution without constant or at least consistent police presence at the clinic. The City actually did consider both more and less physically restrictive buffer zones, and chose the distance that, in its judgment, was the fulcrum between protecting its citizens and protecting free speech rights. The City did not consider individual injunctions against offenders; although if police are unable to cite individuals for violations of certain laws, it is unclear what the legal basis for such an injunction would be. The City also did not formally petition the Commonwealth Attorney General or the United States Attorney General to

enforce FACE at the clinics. Taking this evidence together, the court relies on the Third Circuit's instruction in *Bruni* that the City need not "demonstrate that it has used the least-restrictive alternative, nor . . . that the City demonstrate it has tried or considered *every* less burdensome alternative to its Ordinance." *Bruni*, 824 F.3d at 370 (citing *Ward*, 491 U.S. at 800) (emphasis in original) ("intermediate scrutiny affords some deference to a municipality's judgment in adopting a content-neutral restriction on speech."). Thus, the court concludes that the City has carried its burden to demonstrate that less-restrictive alternatives were tried and failed or that alternatives were closely examined and ruled out.

Although Plaintiffs have demonstrated that the Ordinance substantially burdens their First Amendment rights, Defendants have met their burden to show that the Ordinance was narrowly tailored to achieve a legitimate governmental interest because the City considered less-restrictive alternatives, ruled them out as less effective, and demonstrated that other less-restrictive methods had been tried and failed. Accordingly, the court holds that Plaintiffs have failed to show that they have a likelihood of success on the merits. Nonetheless, the court will now consider the remaining factors in the preliminary injunction analysis.

## C.    Irreparable Harm

The analysis for determining whether Plaintiffs would suffer irreparable harm is comparatively straightforward.  "It is hornbook law that the 'irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages . . . this is not an easy burden.'" *Fulton v. City of Philadelphia*, No. 18-cv-2075, 2018 WL 3416393, *30 (E.D. Pa. July 13, 2018) (quoting *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000)).  However, the loss of First Amendment freedoms, for even a *de minimis* period of time, unquestionably constitutes irreparable injury.  *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (plurality opinion) (citing *N. Y. Times Co. v. United States*, 403 U.S. 713 (1971)).  Thus, if the Ordinance constitutes harm to Plaintiffs' First Amendment rights, such harm is almost unquestionably irreparable.  *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 323 (3d Cir. 2013) (citing *Elrod*, 427 U.S. at 373); *see also* 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."), *quoted in Buck v. Stankovic*, 485 F. Supp. 2d 576, 586 (M.D. Pa. 2007).  As explained at length above, the court holds that the Ordinance is a reasonable and constitutionally appropriate time, place, and

manner limitation on protesters. Plaintiffs are not limited from voicing their beliefs, except that they may not protest, demonstrate, patrol, or congregate within the buffer zone. They may still do so outside the buffer zone, near the clinic, or individually enter the buffer zone as long as they are not protesting, demonstrating, patrolling, or congregating. Accordingly, the court finds that Plaintiffs will not suffer a deprivation of their constitutional rights and, thus, will not suffer irreparable harm if the Ordinance is not preliminarily enjoined.

## D.  Public Interest and Harm to Others

Having concluded that Plaintiffs have failed to satisfy both of the gateway factors necessary for a grant of preliminary injunctive relief, the court need not strictly analyze the remaining factors; however, the court shall briefly address the remaining factors. The remaining factors to be weighed in determining if a plaintiff is entitled to preliminary injunctive relief are (1) the possibility of harm to other interested persons from the grant or denial of the injunction, and (2) the public interest. *Reilly II* at 176 (citing *Transam. Trailer Transport, Inc*., 501 F.2d at 919-20.).

Under the present factual scenario, the final two factors are circumjacent. The harm to "others" is essentially the harm to the public at large asserted by the City. The City argues that the public good is furthered by preventing the exact harm that led to the enactment of the Ordinance. Noise and obstruction of the

public sidewalk would be abated, and violent or aggressive protesters would be less likely to intimidate or harass patients or prevent patients from entering the clinic.  This would also be the harm to others if the injunction were not granted.  It goes without saying, however, that a deprivation of a constitutional right is contrary to the public interest and the harm to others (*e.g.* neighborhood residents, Planned Parenthood employees, and clinic patients), although substantial, does not outweigh such a denial.  *See K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) ("[T]he enforcement of an unconstitutional law vindicates no public interest.").   Because this court holds that the City has demonstrated that the Ordinance is narrowly tailored to satisfy constitutional scrutiny, Plaintiffs can point to no legitimate public interest or harm to others that would support their motion for a preliminary injunction.

Having held that Defendants have carried their burden to demonstrate the constitutionality of the Ordinance, and Plaintiffs have failed to demonstrate irreparable harm, the court need not proceed with the full balancing of the *Transamerican Trailer* factors.   *See Reilly II* at 179-80 (holding that the "likelihood of success on the merits" and "irreparable harm" factors are gateway factors in the preliminary injunction analysis).   However, if this court were to undertake such a balancing test, it is clear that the final two factors, harm to others

and public interest, would also weigh in favor of denying injunctive relief. Accordingly, all four factors, on balance, would favor Defendants.

## E.    Credibility of Plaintiffs as Witnesses

Defendants argue that the court should apply the doctrine of *falsus in uno, falsus in omnibus* to disregard Plaintiffs' testimony at the hearing. (Doc. 101 at 49 (citing *Lambert v. Blackwell*, 387 F.3d 210, 256 (3d Cir. 2004)). To do so, this court must conclude that Plaintiffs "deliberately testified falsely as to a material fact." *Dressler v. Busch*, 143 F. 3d 778, 781 (3d Cir. 1998). Specifically, Defendants point to Plaintiffs' testimony that they saw a drop in the number of people they interacted with at Planned Parenthood in contrast to their testimony that they did not begin counselling at Planned Parenthood until late 2015, approximately three years after the buffer zone was enacted. (*Compare* Tr., pp. 262-263 ("I started going to Planned Parenthood in, I believe it was late 2015.") *with* Doc. 1, ¶61 ("Plaintiffs have regularly engaged in free speech on the public sidewalks and walkways outside of the Planned Parenthood and Hillcrest clinics for years and prior to adoption of the Ordinance did not observe any [confrontational] conduct.").) Defendants also note that Plaintiffs verified a complaint that stated "Plaintiffs seek to have quiet and personal one-on-one conversations with, and to offer assistance and information to, women" and "Plaintiffs do not desire to engage in loud confrontations or any kind of

harassment," yet were aware that former-plaintiff Gross was engaging in aggressive behavior contrary to the peaceful "counselling" allegedly sought by Plaintiffs. (*Compare* Doc. 1, ¶¶ 62, 64 *with* Tr., p. 273 ("You would agree with me that Rosie Gross was generally not up at that clinic to seek quiet and personal one-on-one conversations with, and to offer assistance and information to, women considering abortions? Do you agree with that? [Plaintiff Biter:] Yes.") *and* Defs. Ex. 24 (Video of Rosalie Gross at Planned Parenthood).) Also despite offering assurances that they seek only peaceful counselling, Plaintiffs' brief suggests that they may intend to follow unconsenting women up to the clinic door. (*See* Doc. 88, p. 36 ("[P]assersby usually enter the buffer zone, and Plaintiffs are cut off from any further interaction . . . the buffer zone [is] a big impediment . . . If the buffer zone were not there, Plaintiffs would continue to walk with and converse with willing patients over the 70 feet of public sidewalk leading to Planned Parenthood's door.") (record citations omitted).) Although Plaintiffs describe these women as "willing" it is unclear why a "willing" listener would be unable to simply stop outside the buffer zone to speak with Plaintiffs as opposed to being followed to the clinic doorstep. These contradictions cast doubt on the veracity of Plaintiffs' testimony, but have little bearing on the disposition of the case. The purpose of the Ordinance was not to bar Plaintiffs from peaceful counselling or distributing literature, nor does it. The scope of the Ordinance is limited both in

the actions it proscribes and the physical boundaries it covers. As explained at length, above, Plaintiffs' ability to peacefully offer counselling, as they testified to desire, is not wholesale prohibited by the Ordinance. To the extent Plaintiffs testimony can be reconciled, it is possible that they engaged with fewer patients overall after Hillcrest closed. Because Plaintiffs stated that they did not counsel at Planned Parenthood prior to the Ordinance's enactment, they have little basis to argue that the Ordinance directly led to their alleged decrease in engagement. Thus, even taking Plaintiffs' testimony as true, the court's analysis would remain the same.

## III.     Conclusion

The Court again emphasizes the paramount importance of First Amendment rights in the continued functioning of our democracy. However, the Supreme Court has, time and time again, recognized that limits to these rights exist. Here, the City has placed reasonable and constitutional limits on the free speech rights of protesters at certain locations within its municipal limits. The Court holds that the Ordinance is content neutral and, thus, subject to an intermediate scrutiny analysis. In determining whether to grant Plaintiffs request for a preliminary injunction, the court applied the factors as set forth by the Third Circuit in *Reilly II*. In doing so, the court concluded that: (1) Plaintiffs failed to demonstrate a reasonable likelihood of success on the merits because Defendants met their burden of

demonstrating that the Ordinance was narrowly tailored to achieve a legitimate governmental interest; (2) Plaintiffs failed to demonstrate irreparable harm; and (3) even if Plaintiffs had done so, the final two factors in the preliminary injunction analysis weighed against granting injunctive relief. Accordingly, Plaintiffs' motion for preliminary injunctive relief is denied. An appropriate order will follow.

 s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated: August 23, 2018